1  Razi A. Shah, CSBN: 181968
   Attorney at Law
2  2140 - Shattuck Avenue, Suite 411
   Berkeley, California 94704
3  Telephone:    510-486-1190
   Facsimile:    510-486-1339
4

FILED

2009 MAR 11 PM 1: 25

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
OAKLAND, CA.

Attorney for the Debtor and debtor in possession John Le Tung aka John Tung Le

5

6

7            UNITED STATES BANKRUPTCY COURT
             EASTERN DISTRICT OF CALIFORNIA
8                    OAKLAND, DIVISION

9

10 In Re:                          CASE NUMBER: 07- 40169

11 SAIGON PLAZA ASSOCIATION, LLC   Chapter 11
   a, California Limited Liability Company
12                                 **OPPOSITION TO DEBTOR'S FIRST
                                   AMENDED DISCLOSURE STATEMENT**
            Debtor,                **FOR SECOND AMENDED PLAN OF
13                                 REORGANIZATION and REQUEST FOR
                                   INVESTIGATION OF THE CASE**
14

15 _____/      Date:     March 16, 2009
                                   Time:     02.00 pm
16                                 Court:    Hon. Leslie Tchaikovsky
                                             Courtroom 201
17                                           1300 - Clay Street, Oakland, CA

18

19    TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, AND THE OFFICE OF THE

   U.S. TRUSTEE. The above referenced debtor, debtor in possession, and Operating Manager of SAIGON
20
   PLAZA ASSOCIATION, LLC, John Le Tung aka John Tung Le, objects to the above referenced disclosure
21
   statement, and requests for immediate inquiry in the case, by the court for the following reasons:
22
                                        I.
23               **VALUE OF THE SO CALLED SINGLE ASSETS**

24 1.    The so called "*single asset*", the real property located at *380-388 Twelfth Street Oakland California*,

25       in "*as is condition*" is worth more than *$5,000,000.00 (Five Million Dollars).*

26 2.    The estimated value is based on the facts and as per attached *Exhibits A, B and C:*

27       a.    In as condition, the property can be redesigned in any form by anyone, and can be developed

28             *as a masterpiece structure, in China Town Oakland*. Because there are no empty lots and

             buildings that can be redesigned so quick, so economically, for any form of development.

Objection To The Disclosure Statement                    1

b.   This is a historic structure, as per *Exhibit C*. Property sits with in the bounds of the old historic *Oakland China Town of 1800*, between 8th *Street and* 12th *Street*. The basic hard work, as it relates to the development, dealing with the issues of planning and design has been passed through the *City Government, and Historic Society as per attached Exhibits*.

c.   The debtor John Le Tung, has been in contact with *Saigon National Bank*, which is interested to open a branch or even their headquarter, at this location, depending on their feasibility study. However, because of pending litigation Bank is very reluctant to jump in so fast. The Bank interest in the location, however, signifies the fact that the so called single asset can be redesigned by any *commercial entity like Bank*, which has long term economic interest in the Oakland China Town.

d.   Structure can also qualify for *EB-5, Investor Visa*. That means, if a foreigner, invests into this project, which result in the creation of *10 U.S. jobs*, the investor and his family members can get *Legal Permanent Residency (Green Card) in the United States*. This is a very big incentive for a Chinese or Asian investor to come to the United States and conduct their business in Oakland China Town. It provides an environment to any Asian investor, as if the investor never left his home. The economic and social environment of any China Town is not effected in the same manner, as the present economic crises have effected, outside the China Towns.

## II.
## THEN WHY THERE ARE NO TAKERS?

3.   Because the so called *"Single Asset"* has never been put on the market for sale. We are now two years in the Bankruptcy Court and no one listed the property with any real estate broker. Even the next door neighbor to the structure, do not know what is going on. If an order was need by the court, to put the asset on the market, then why no one has ever approached this court for such an order?

4.   As per attached Exhibits, in the present economic market, *Asian Investor*s are looking for such unique assets. This asset is located with in *"Historic China Town"*, as it is a historic structure as per Exhibit C. Why the subject assets has not been listed with an any real estate broker, and only plans we have are by the so called local investors and the CMR, the hard money lender? Who are these local investors and what is their relationship with CMR?

## WHY OBJECTION AND WHY REQUEST FOR INVESTIGATION?

5. The caption of the pleadings says "DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED PLAN OF REORGANIZATION". What happened to the "FIRST PLAN OF REORGANIZATION"?

6. As it appears the first plan was a joint venture, between the so called local investors and the *California Mortgage Realty (CMR), the hard money lender.* However somehow things did not work out between these two partners, and now they are approaching this court with what their new sinister scheme, to grab the assets of these Vietnamese families.

7. Why we are getting these plan by the CMR only? In spite of the value of the asset why these Vietnamese families are victimized? These are very serious questions and the debtors request the court for investigation. The most important question is how these Vietnamese families have come under the grip of these hard money lenders?

8. Debtors family members and friends have retained the services of *Jonathan S. Kitchen, Esquire of Law Office of Cox castle & Nicholson,* for advisory opinion and not as attorney of record for any debtor, in this case. Debtors in this case will meet with Mr. Kitchen, sometimes before the March 16, 2009, hearing, and will address the court as to their further objections to the plan.

Date: 3-11-2009

Respectfully Submitted,

_____
Razi A. Shah
Attorney for the debtor and debtor in possession
John Le Tung aka John Tung Le

Date: 3-11-2009

_____
John Le Tung aka John Tung Le
Debtor and debtor in possession

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 4 of 22



COMPANIES
PROPERTY

# Chinese property investors seek California dream on the cheap

By Geoff Dyer in Beijing
Published: December 6 2008 02:00 | Last updated: December 6 2008 02:00

Chinese bargain hunters are preparing to descend on the US cities such as Los Angeles and San Francisco where beleaguered homeowners have suffered some of the steepest price falls in the country.

SouFun - the biggest real estate website in China - is organising a trip for potential investors next month to look at properties in California and possibly Nevada, also one of the states hardest hit in the housing slump.

Liu Jian, the company's chief operating officer, said about 300 people had expressed interest in the trip in the three days since it was first advertised, although the company would only take a small group of people on the first visit.

"There are a number of places in the US where property prices have fallen by a large amount," he said. "Given the problems in the Chinese market now, many people have been asking us about taking a look at overseas markets, especially the US."

Mr Liu said that the trip would focus on California - particularly San Francisco and Los Angeles, whose big Chinese populations would make potential investors more comfortable - but might also include Nevada.

Restrictions on taking money out of China would be an obstacle, he added, but some potential investors had an overseas connection such as a foreign passport that would make it easier.

Property professionals say there is considerable interest in investing abroad among wealthy Chinese, who often hold a high proportion of assets in property.

"The US market absolutely terrifies me," said one Shanghai-based real estate executive. "However, there are plenty of people here who think this a great time for bottom-fishing."

There is plenty of opposition in China to SouFun's plan, which has attracted heavy publicity.

"Unless these people need a house in the US to live in, this is senseless," said Yi Xianrong, a real estate expert at the Chinese Academy of Social Sciences. "A few years ago, there was a lot of talk about investing in German real estate but most of the people who did so lost a lot of money."

SouFun provides information on property markets in more than 100 cities and has more than 40m registered users. The company was acquired by Australia's Telstra two years ago.

Copyright The Financial Times Limited 2009

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2009.

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 5 of



You Get **4 WEEKS** **RISK-FRE** Get your 4weeks

**FT.com** **FINANCIAL TIMES**

COMPANIES
PROPERTY

FT Home > Companies > Property

# Chinese property investors seek California dream on the cheap

By Geoff Dyer in Beijing
Published: December 6 2008 02:00 | Last updated: December 6 2008 02:00

Delicious     reddit     Digg     Facebook     stumbleupon     Yahoo! Buzz

**MORE FROM THIS SECTOR**

Japan's Pacific Holdings seeks bankruptcy protection
German banks take to UK commercial property
Property party in Cannes adopts a more sober mood
Corrections - British Land and Land Securities; Taprobane; Kicking Horse Mountain Resort
Commercial property under pressure across US
Australia extends short-selling ban
Segro seeks support for £500m cash call
Taylor Wimpey to delay results
Commercial property markets tumble
Brixton axes chief Wheeler in move towards cash call
Wolseley close to launching £1bn rights issue

**LATEST COMPANIES NEWS**

HSBC launches Hong Kong charm offensive to calm shocked investors
EADS warns of uncertain outlook for second half
Citi has strong start to the year
Lehman buy-out house reborn
Safra clients offered Madoff compensation
Pacific files for bankruptcy protection
Barclays warned on toxic asset dumping
FBI in search for Stanford 'victims'

**RECENT REPORTS**

Market research reports

| | | | |
|---|---|---|---|
| Hovnanian Enterprises, Inc. - SWOT Analysis | Datamonitor | 3/4/2009 | $125 |
| Kimco Realty Corporation - SWOT Analysis | Datamonitor | 3/4/2009 | $125 |
| Duke Realty Corporation - SWOT Analysis | Datamonitor | 3/4/2009 | $125 |
| Westfield Group (Australia) - SWOT Analysis | Datamonitor | 3/4/2009 | $125 |
| Multi-Unit Apartment and Townhouse Construction in Australia - Industry Market Research Report | IBISWorld | 3/3/2009 | $565 |

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 6 of



American Life Inc.; Property Investment & Management

# ▶ EB-5 Visa Information

**About Us**

░ **Who We Are**

The EB-5 Visa provides the most direct path to a Green Card, based on an investment in a US business. The EB-5 visa does not require the applicant to manage the day-to-day affairs of a business. One may invest in an existing business, or a new business. More than one person may invest in the same business. The EB-5 investor may be a minority owner of the business.

For a single investment, Green Cards are granted to the investor's immediate family, which includes a spouse and all children under 21 years old.

The US requires an investment of $1,000,000 in a trade or business, and the creation of jobs for ten additional employees. The program reduces the investment to $500,000 in certain targeted unemployment areas.

Any trade or business that employs at least 10 people, per investor, qualifies for this program. One may start a business, buy a business, or invest in an existing commercial concern. Although immigrant investors may play a role in management, the regulations deem limited partners or members of the board of directors as active participants in management. As long as the business employs at least 10 people per investor it may accept any number who make the required investment.

Funds may come from any legal foreign or US source, including gifts and divorce settlements. Borrowed investment funds qualify as long as those funds are not secured by the assets of the target investment.

### Further EB-5 information  ★

- ❶ **Investor Green Card Details**
- ❶ **Immigration Books**
- ❶ **EB-5 FAQ**

American Life Inc.
3223 3rd Avenue South, Suite 200
Seattle, WA 98134
Phone: 206-381-1690
Fax: 206-381-3927
E-mail: info@americanlifeinc.com

Copyright © 2006 American Life Inc.



**Online Services**

**Banking Products**

**Rates & Fees**

**Calculators**

**About Us**

**Contact Us**

**Help/FAQs**

## About Us

### A Message from the CEO

Welcome to Saigon National Bank's web site for internet banking, online services and general information about our bank and other services. We are located at the center of "Little Saigon" in Westminster, California. Our goal is to participate in the vibrant economy of the "Little Saigon" area. We welcome the opportunity to participate. As a local bank our customers have come to know and trust our staff at the bank. We demonstrate our trust everyday with each customer meeting.

This web site allows you to conduct your banking business with us just as if you were in the bank but within the comfort of your home or office. The security protocols we have established have been designed to safeguard your information and be customer friendly.

We believe in the personal touch to service. Use our internet banking to complement your financial requirements but keep in mind we welcome your call or visit to the k

Sincerely,

John J. Kennedy
President and CEO

15606 Brookhurst Street   I   Westminster, CA  92683

phone. (714

Case: 07-40169    Doc# 264    Filed: 03/11/09    Entered: 03/12/09 17:38:18    Page 8 of



**Online Services**

**Banking Products**

**Rates & Fees**

**Calculators**

**About Us**

**Contact Us**

**Help/FAQs**

## About Us

### History

Saigon National Bank is a locally owned community bank devoted to serving the financial needs of the Vietnamese business community in Southern California. Our shareholders, directors and bilingual staff are all local people who know the community and the culture.

### Mission & Vision Statement

Our mission is to facilitate and enhance the economic activity of the communities in which we operate and serve. We accomplish our mission by advising our customers on which bank products and services fit their financial requirements. Loan decisions are made locally by experienced commercial bankers who have extensive lending experience in all areas of credit including working capital loans, asset based loans, letters of credit, leasing, business expansion and commercial real estate.

Our bank charter allows us to focus on the local business community. We are a direct lending bank withou

We also offer certificates of deposits with a wide range of terms, amounts and interest rates to match the flexibility requirements of our depositors.

**Hieu Tran**
**Chairman of the Board**

**Loc P. Huynh**
**Dat Phan**
**Vice Chairmen of the Board**

**Directors**

| | |
|---|---|
| James Avery | Kiem Nguyen |
| Andrew Chien, Ph.D. | Thanh Phung, M.D. |
| Binh Ho | Lee Ross |
| John J. Kennedy | Kim Tran |
| Ban Duc Nguyen | |

**Executive Officers**

**John J. Kennedy, President & CEO**
**Mike Miller, EVP & CCO**

Case: 07-40169   Doc#: 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 9 of 22



**Online Services**

**Banking Products**

**Rates & Fees**

**Calculators**

**About Us**

**Contact Us**

**Help/FAQs**

## Contact Us

### Location

**Call Saigon National Bank Today**

Whether you need a checking account, a business loan, or
simply a bank that treats you like a valued customer and not
an "account," give us a call. We'd like to be your bank.

| | |
|---|---|
| **Address:**<br>15606 Brookhurst Street<br>Westminster, CA 92683<br><br>**(714) 338-8700**<br>**(714) 338-8730 fax**<br><br>**Hours:**<br>M-F (9:00 am – 5:00pm)<br>Sat (9:00 am – 1:00pm) | Contact us via a secure<br>email form. |

15606 Brookhurst Street  |  Westminster, CA 92683                    phone. (714

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 10 of

# Oakland Chinatown History

## CHINATOWN OVERVIEW

### Brief History of Oakland, California's Chinatown

Chinese came to Oakland in significant numbers in the 1850s, after gold was discovered near Sacramento in 1848. They were primarily from southeastern China near Hong Kong. Chinese started congregating in San Francisco and Oakland after being driven from the gold fields by bigotry and violence.

The first Chinese settlements in Oakland were at First and Castro Streets, Telegraph Avenue between 16th and 17th Streets, and San Pablo Avenue between 19th and 20th Streets. These settlements were frequently under siege. One burned down mysteriously. City leaders forced two other Chinese settlements to relocate. By the 1870s, Chinese began setting down roots at 8th and Webster Streets, the epicenter of today's Chinatown.

More Chinese settled in San Francisco, but Oakland became a viable alternative because of jobs, fertile land, good climate, and easy proximity to San Francisco. Chinese Oaklanders of this era mostly took low-paying jobs. They built Temescal Dam and Lake Chabot Dam. They worked in canneries, cotton mills, and explosives factories. They were cooks, gardeners, houseboys, and laundrymen. They made cigars, helped develop the shrimp and fisheries industries, and labored in the city's thriving railroad building industry. They grew vegetables and fruits, introducing farming innovations and experimenting with new crops like asparagus. Traveling throughout the East Bay region, Chinese peddled fresh fruits and vegetables from baskets hung from a long pole and later in trucks.

Oakland Chinese often faced hostility. Local politicians passed anti-Chinese legislation of one sort or another. Virulent anti-Chinese sentiments broke out throughout California, including Oakland, in the early 1870s, as the general economy soured. The California-grown anti-Chinese movement moved to Washington, D.C., where Congress passed the Chinese Exclusion Act in 1882, barring Chinese laborers. The Chinese population in Oakland and elsewhere dropped sharply, but the 8th and Webster Chinatown survived.

The 1906 San Francisco earthquake and fire provided an unexpected boost to Oakland's Chinatown. Thousands of San Francisco Chinese who fled to Oakland chose to stay in Oakland. Some white Oaklanders, however, pressured the city to restrict the growing Chinese population to the 8th and Webster neighborhood. Chinatown grew nonetheless, from the waterfront up to 10th Street along the Webster corridor.

Even as Chinatown grew, it became more isolated. But the Chinese developed a complex society. They organizedmen and women's sports teams. The Wa Sung Service Club began as a baseball team in the 1920s. Chinese organizations emerged and evolved – family and district associations, business associations, tongs, and civil-rights groups. Some tongs engaged in criminal activities like the Chinese lottery. Patriotic organizations had strong ties to Chinatown. One was the Kuomintang, the political movement founded by Sun Yat-Sen, leader of the Chinese Republic. Another was the Chinese American Citizens Alliance (CACA), which fought for the civil rights and assimilation of Chinese Americans. The Oakland lodge at 8th and Harrison Streets was the third CACA branch formed.

Oakland Chinese remained largely segregated in the first half of the 20th century. But as family life gradually developed in Chinatown, a process of Americanization began, and Lincoln Elementary School was a principal vehicle of acculturation. Chinatown children also went to Chinese schools. By the early 1930s, there were as many as a dozen such schools in Chinatown. In 1953, the Oakland Chinese Community Center with a Chinese school opened at 9th and Harrison Streets to great fanfare. Protestant Christian churches have been influential in Chinatown. Chinese Presbyterian, Methodist, Episcopal and Baptist churches continue to have followings in Chinatown today.

A second cataclysmic event -- World War II -- accounted for Chinatown's greater integration in Oakland and the creation of a new Chinese American middle class. Congress repealed the Chinese Exclusion Act in 1943, reflecting China's status as a U.S. ally in World War II. Shipyards hummed in Oakland, employing many people, including Chinese. Chinatown businesses benefited. The Oakland Chinese population grew 37.5 percent to 5,500 in the 1940s. Some Oakland Chinese fought in the war,

Case: 07-40169    Doc# 264    Filed: 03/11/09    Entered: 03/12/09 17:38:18    Page 12 of
22

while others raised funds to help China battle the invading Japanese. This duality has been a continuing undercurrent for older generations of Chinese Americans.

For the smaller number of Japanese Americans around Chinatown, however, World War II wasn't a good time. They were shipped off to internment camps in remote areas of the west. The Japanese presence in Oakland has never been quite the same. Filipinos also found work in Chinatown in the 1930s and 1940s.

In the post-war years, the younger generation Chinese Americans began getting work and buying homes in other parts of Oakland that once forbade Asians. Ironically, the World War II prosperity was short-lived for Chinatown. With the shipyards shut down and its younger generation moving out, Chinatown suffered. Major public projects -- the Nimitz Freeway, the Bay Area Rapid Transit District, Laney College, and the Oakland Museum – gobbled up Chinatown housing. The insulated vibrancy of Chinatown, evident in the decades before and during the war, became muted in the 1950s.

Chinatown's dormant state lasted well into the 1960s, until Congress liberalized laws allowing more immigration from Asia (and Latin America). Oakland Chinatown experienced a renaissance, beginning in the 1970s. The renaissance was accelerated when the end of the Vietnam War brought over thousands of refugees from Southeast Asia, some of them ethnic Chinese.

Oakland's Chinatown showed new life. Shuttered storefronts became restaurants and shops. Gasoline stations transformed into multi-use buildings. Property values soared. More banks opened Chinatown branches. Redevelopment, a dream of Chinatown leaders since the somnambulant 1950s, resulted in the multi-purpose Pacific Renaissance Plaza on 9th Street, Franklin and Webster Streets. This project attracted Hong Kong money, as have other smaller developments.

This growth brought greater ethnic diversity to Chinatown and a continuing cycle of immigration adaptation issues. The Chinese were the first Asian presence in Oakland, followed by Japanese, Filipinos and Koreans. After 1965, the community exploded with immigrants and refugees from all over Asia. Traditional Chinatown's resurgence and the creation of a new Asian district east of Lake Merritt are attributable in part to a Southeast Asian influx.

Perhaps Chinatown is now a misnomer because the traditional Asian district at 8th and Webster, while still very Chinese, is much more than that today. The ebb and flow of the Asian communities in Oakland have been and will continue to be influenced by immigration policies and geopolitical and globalization trends. With multiple generations of Chinese, and other Asians living all over the city and a population of at least 60,000, the Chinese American and Asian American presence in Oakland is now deeply rooted.

All contents of this site -- interviews, photos, history overview, personal histories, author's biography -- are copyright protected and may not be used for commercial purposes. Contact William Wong for permission to use any content of this site for educational or personal purposes.

Home  |  Chinatown Overview  |  Personal Histories  |  Photo History Book  |  The Author  |  Contact

© 2005 William Wong

site design: www.circlej.com

Case: 07-40169    Doc# 264    Filed: 03/11/09    Entered: 03/12/09 17:38:18    Page 14 of 22

## Historical Resource Evaluation

Proposed Renovation and Addition to the
Marks Building at 380-188 12th Street
Oakland, California

### History and Significance of the Property

The single story commercial building located at 380-388 12th Street was constructed in 1912 by Martin E. Marks, owner of the adjacent Hotel St. Mark which was built 5 years earlier. This tall one-story structure replaced two wood frame structures which occupied the same 50-foot wide lot. The previous structure adjacent to the hotel had been a slightly taller two story building, according to the Sanborn Maps of 1889 (corrected to 1901) and photographic records. The original plans of the Marks building were not on file with the City of Oakland, and the architect or designer is unknown.

No original or early photographs of the Marks building have been discovered, however the building's ground floor storefront has clearly been altered and there is little evidence of its original appearance, other than its presumed original division into three storefronts of roughly equal width as shown on the Sanborn Map, circa 1935. As an altered, small, mid-block structure with an Oakland Cultural Heritage Survey (OCHS) rating of "Cb-1+", the building's principle significance is as a contributor to the Downtown Oakland Historic District, which is listed on the National Register of Historic Places and is an Area of Primary Importance (API) identified in the Preservation Element of the Oakland General Plan. The building now stands as the easternmost structure on 12th Street in both the API and the National Register district, since the neighboring structure at 368-72 12th Street was demolished in the early 1990s and replaced with the two-story stucco structure which now occupies that adjacent site.

As documented in the Oakland Cultural Heritage Survey form and the National Register registration form for the Downtown Oakland Historic District, the district is characterized by a general pattern of skyscrapers spaced among lower buildings which create a distinctive skyline. The tall buildings, generally office buildings, occur at intervals of one or two per block, surrounded by low to medium-rise small office and specialty retail buildings which mark a transition to surrounding uses and building types. The district's contributing buildings generally share the following characteristics:

- Structures are built with no front and side setbacks.
- Most structures are three stories in height or over.
- Only a few structures exceed 15 stories in height.
- Half of the tall buildings are designed as free-standing towers, fully finished and ornamented on all sides.
- The majority of buildings date from 1901 to 1929.
- Buildings share a general unity of design achieved by the use of brick and masonry surfaces,

NANCY ELIZABETH STOLTZ AIA · AICP DESIGN AND PLANNING

two-or three part vertical composition, neoclassical ornament, projecting terra cotta or metal
cornices, the use of terra cotta cladding or ornamentation and Chicago style window
treatment.

The Downtown District encompasses 56 buildings, 43 of which contribute to its significance.
The Marks building is one of only five single-story buildings in the district. Of these five, only
two others are contributing structures, the Central Building and Loan Association at 363-69 13th
Street and the Weiner building at 405-07 15th Street. Therefore the building is somewhat
atypical of contributing structures with respect to height; however, it does share most of the
other characteristics of the contributing low-rise commercial buildings found in the district which
are enumerated above.

## Character Defining Elements

The description of the Marks building found in the National Register form identifies its
important character defining elements as follows:

> 380-88 12th Street is a one-story brick Beaux Arts derivative store building. The enframed
> window-wall facade has three storefront bays (extensively remodeled), with an elaborate
> stepped and crenellated brick parapet, the central section of which is embellished with a gray
> cast plaster shield and garland. Smaller plaster garlands decorate the faces of the end piers. A
> metal cornice with console brackets above a patterned red and beige pressed brick facade
> extends across the top of the storefronts.

The character defining elements are clearly limited to the unaltered portion of the facade above
the storefront framing. Even the piers which bracket the storefront have been altered with the
application of a cut stone veneer which projects beyond the face of the brick veneer above it.

The building is an unreinforced masonry structure and as such is subject to the City's URM
Ordinance (No. 11613 C.M.S.). The exposed unreinforced brick bearing wall along the side
property line was originally concealed by the adjacent structure but is now exposed to view as
the replacement structure is set back several feet from the common side property line. Although
this wall is part of the original historic building fabric, it is not a character defining element as it
was not originally intended to be visible.

## Proposed Alterations

The proposed project consists of the following alterations and additions to the existing structure:

1. Maintenance and cleaning of the facade including all elements above the line of the storefront
   framing and repainting of previously painted cornice and entablature elements.

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 16 of
22

2. Reinforcement of the existing parapet with the use of shotcrete applied to the back side. Existing openings in the parapet "balustrade" will be maintained.
3. Exterior facing of the supporting beam below the level of the existing brickwork with painted wood molding and a dentil course, and facing of the piers bracketing the storefront with fluted, painted wood pilasters.
4. Insertion of a new storefront with three equal bays and recessed entries into the existing opening, including transparent transom and storefront glazing framed in wood and storefront bulkheads faced with ceramic tile.
5. Retention and bracing of the existing brick bearing wall and other seismic upgrading as required.
6. Demolition of approximately 750 square feet of ground floor space (which appears to be a later building addition) at the rear of the existing building to provide required yard area for the proposed residential units.
7. The addition of four residential units on two additional floors, setback from the street approximately 7 and 20 feet, respectively, from the property line at the street.

## Discussion and Evaluation

### Historic Preservation Element

The Historic Preservation Element of the Oakland General Plan includes policies which would apply to the proposed project. The most relevant are Policies 3.1 and 3.5 which govern discretionary permit approvals as required in the case of the proposed project. In accordance with these policies, the City must make one of three findings, two of which may be appropriate in this case:

1. The design matches or is compatible with, but not necessarily identical to, the property's existing or historical design, or
2. The proposed design comprehensively modifies and is at least equal in quality to the existing design and is compatible with the character of the neighborhood.

The first finding could be made with regard to the storefront renovation. The existing historic, character defining elements of the facade will be maintained and the design of the new storefront, though not identical to the property's historical design is certainly compatible with it.

The second finding may be more relevant to the upper floor addition, which could be characterized as a comprehensive modification which is compatible with the existing design and the character of the neighborhood and district in which it is located. The addition will bring the structure to a height of three stories in a National Register district where most contributing structures are three stories in height or over.

Case: 07-40169    Doc# 264    Filed: 03/11/09    Entered: 03/12/09 17:38:18    Page 17 of
22

## Secretary of Interior's Standards and Guidelines

In general, the California Environmental Quality Act (CEQA) provides that a project that follows
the Secretary of Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic
Buildings shall be considered as mitigated to a level of less than a significant impact on the
historical resource (CEQA Guidelines Part 15064.5). The proposed project is consistent with
the definition of "rehabilitation" provided in the Standards, as "the process of returning a
property to a state of utility, through repair or alteration, which makes possible an efficient
contemporary use while preserving those portions and features of the property which are
significant to its historic, architectural, and cultural values."

The unreinforced masonry building, which is currently uninhabitable, will be returned to a
contemporary commercial and residential use. Both the proposed renovation of the existing
storefront and the addition have been designed to follow the Secretary of Interior's Rehabilitation
Standards and Guidelines as described below. Therefore, under Section 21084.1 of CEQA there
would be no substantial adverse change in the significance of the historic resource (i.e. the
significance of either the Marks building itself or that of the National Register District).

All of the historic features and character defining elements documented in the Oakland Cultural
Heritage Survey form and the district registration form will be maintained and treated in
compliance with Standards 2 - 7. ( See attached for complete list of 10 Standards.) The existing
ground floor of the building which is now uninhabitable will be returned to its historic commercial
use and the new residential use of the addition will not require changes to the defining
characteristics of the building or its environment, consistent with Standard 1.

Standards 9 and 10 are most applicable in the case of an addition to an historic structure. The
residential addition is consistent with Standards 9 and 10 in the following ways:
- no historic materials will be destroyed,
- the new work will be differentiated from the old,
- the new work will be compatible with the massing, size, scale and architectural features of the
  historic property and its environment and the district as a whole, and
- the new addition, if removed in the future, would not impair the essential form and integrity
  of the historic property and its environment.

Standard 8, which pertains to archeological resources is not applicable to this project.

## Effects of the Residential Addition on the Historic Building and District

The most dramatic change in the building with a potential to impact the historic character of the
building and the district is clearly the residential rooftop addition. In addition to the Secretary's
Standards discussed above, a number of the Secretary's Guidelines for Rehabilitating Historic
Buildings address the issue of new additions to historic buildings. The guidelines that are most

Case: 07-40169   Doc# 264   Filed: 03/11/09   Entered: 03/12/09 17:38:18   Page 18 of
22

relevant to this project make the following recommendations:

- Designing additional stories, when required for the new use, that are setback from the wall plane and are as inconspicuous as possible when viewed from the street.
- Designing new additions in a manner that makes clear what is historic and what is new.
- Considering the attached exterior addition both in terms of the new use and the appearance of other buildings in the historic district or neighborhood.

The first recommendation has been successfully implemented by the use of graduated setbacks from the street wall plane of the existing building for the two upper floors. This change was implemented upon a review of an initial design of the project which showed only a minimal, uniform street facade setback for both additional floors. (See letter of November 19, 1999 from Nancy Stoltz to John Britton.) As indicated in the proposed building cross-section, the new second floor level is set well below the top of the existing parapet and nearly 7 feet back from the street facade, which will make it quite inconspicuous when viewed from 12th Street, particularly given the height of the existing brick parapet. The proposed third floor has been set back nearly twenty feet from the street to minimize its appearance when viewed from the street.

Neither of the residential floors would be readily apparent from the vantage point of the sidewalk in front of the property, but would become visible from across the street and from vantage points to the southeast, as the neighboring two-story building is approximately the same height as the existing Marks building and there is a vehicular driveway adjacent to it which provides a view corridor over the top of that building. The rear portion of the rooftop addition would also be visible when viewed from the vicinity of 13th and Webster Street as there is a surface parking lot at that corner of this same block. If that property were developed in the future, the rooftop addition may no longer be visible from that intersection. Though visible from nearby vantage points, the addition would not be conspicuous as its height would recede visually due to the setbacks of the upper floors.

The new addition is clearly designed in a manner that makes clear what is historic and what is new. In addition to the separation in wall planes between existing and new construction, the new construction will be finished in cement plaster, a different but compatible material to the brick of the historic facade. The existing exposed brick load bearing wall will be strengthened and retained, with a new plaster wall for the residential addition set above and behind it.

The design of the addition is simple in its detailing but references design motifs of the original, reflecting the proportions of the imposing solid brick parapet in its detailing and massing. The design of the second floor facade is kept purposefully simple, due to its proximity and function as a back-drop for this elaborate parapet. A pair of pilasters and a simple horizontal parapet cap provide visual interest. The door and window openings are grouped uniformly between the pilasters, but they will be largely screened from view by the existing historic parapet. The third floor facade, which is further removed from the historic facade, has a central projecting bay set well behind the solid panel of the existing brick parapet wall and terminates in a simple, corbelled

NANCY ELIZABETH STOLTZ                 AIA · AICP                          DESIGN AND PLANNING

Case: 07-40169    Doc# 264    Filed: 03/11/09    Entered: 03/12/09 17:38:18    Page 19 of
22

cornice at the top of its parapet.

The issue of how this proposed project would relate to other buildings in the historic district has been referenced in part above. Even with the additional two floors, the building would be only three stories in height, which is at the low end of the range for the majority of contributing buildings in the district, and therefore compatible in height and scale. Because the proposed residential floors have been kept to minimal heights and setback from the street as described above, the project should not have an adverse visual impact on the district as a whole.

As to its relationship to the adjacent St. Mark Apartments (formerly the Hotel St. Mark), the proposed rooftop addition will clearly impact the light and air of the adjacent windows at the common side property line. The previous building which occupied the site of the Marks building for several years after the adjacent Hotel St. Mark was built was two full stories in height. It was somewhat taller than the existing historic building but was clearly not incompatible with its neighbor, nor would this project be from the standpoint of its visual impact on the district.

The issue of the window blockage appears to be a legal one rather than a cultural resources issue. The side elevation of the hotel building is unornamented, except for the elaborate cornice and the pilasters which wrap around the street corner of the eighth story to form a giant order entablature. These would not be affected physically or visually by the proposed addition to the Marks building. However, if a setback from the side property line should be proposed to provide light and air to the neighboring windows, the design of the project should be reevaluated as this would very likely affect the massing of the addition and design of the facade of the additional floors when viewed from the street.

## Conclusions and Recommendations

The project as proposed will be in substantial compliance with the Secretary's Standards and Guidelines and consequently would not cause a substantial adverse change in the significance of either the historic resource itself, the former Marks building located at 380-388 12th Street, or the Downtown Oakland Historic District which is listed on the National Register of Historic Places.

However, to ensure that the Secretary of Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings are followed in the renovation of the historic facade, it is recommended that standard conditions stipulating such compliance be part of any project approvals. Of particular concern are the use of appropriate cleaning methods for historic materials, appropriate paint removal (where necessary), avoidance of inappropriate paints or sealers on historic masonry surfaces, and appropriate care in repairing or replacing deteriorated elements should they be encountered during the renovation and construction process.

NANCY ELIZABETH STOLTZ           AIA · AICP           DESIGN AND PLANNING

1

**PROOF OF SERVICE**

2

**UNITED STATES BANKRUPTCY COURT)**
3  **EASTERN DISTRICT OF CALIFORNIA**  )
**OAKLAND, CALIFORNIA**      )       *Case No: 07-40169*
4                                       *In Re Saigon Plaza Association, LLC*
*Debtor,*

5

      I am a citizen of the United States and a resident of the County of Alameda. I am over the age of 18
6  years and not a party to the within above-entitled action; my business address is *2140 - Shattuck Avenue,*
*Suite 411, Berkeley, California 94704.*
7

     On *March 11, 2009,* I served the following:
8

      **"Opposition To Debtor's First Amended Disclosure Statement**
9       **For Second Amended Plan of Reorganization and Request for**
      **Investigation of the Case". "**
10

     on the persons listed on the service list by placing a true copy thereof in a sealed envelope, postage
11  fully prepaid, and served same as follows:

12

\_\_\_\_\_xx\_\_\_\_\_   BY MAIL:    By placing an original or true copy thereof to be placed in sealed envelopes, first class mail
13                           with postage fully prepaid for deposit with the U.S. Postal Service, addressed as indicated below,
                          and at my place of business, placed for collection, processing, and mailing on that date following
14                           ordinary business practices. I am readily familiar with the business practice at the Law Offices of
                          Razi A. Shah for collection and processing of correspondence for mailing with the U.S. Postal
                          Service. Pursuant to such practice, correspondence so collected and processed is deposited with
15                           the U.S. Postal Service that same day in the ordinary course of business.

16

     I declare under penalty of perjury that the foregoing is true and correct and that this document is
17  executed on *March 11, 2009,* Berkeley, California.

18

                                                                                     Razi A. Shah
19

20

**SERVICE LIST**

21

U.S. Department of Justice
22  U.S. Trustee, Region 17, Oakland Office          Marc Alan Fong, Esquire
1301 - Clay Street, Suite 690 - N               Richard Fong, Esquire
Oakland, California  94612                  Fong & Fong
23                                          1141 - Harbor Bay parkway, Suite 206
Jonathan S. Kitchen, Esquire             Alameda, California 94502 - 2218
24  Cox Castle & Nicholson
555 - California Street, 10th Floor
25  San Francisco, California 94104-1531         Darya S. Druch, Esq.,
                                         Attorney at Law
                                         1 - Kaiser Plaza, Suite 480
26  Steven B. Sacks, Esquire               Oakland, California 94612
Sheppard, Mullin, Richter & Hampton LLC
27  Four Embarcadero Center, 17th Floor
San Francisco, California  94111

28

**PROOF OF SERVICE**

| | |
|---|---|
| 1 | Douglas A. Plazak, Esquire |
| | Reid & Hellyer |
| 2 | 3880 - Lemon Street, Fifth Floor |
| | P.O.BOX, 1300 |
| 3 | Riverside, California 92502 -1300 |

David G. Bicknell, Esq.,
Bicknell Law Offices
2542- South Bascom Avenue
Campbell, California 95008

Jeffrey D. Trowbridge, Esquire
Attorney at Law
180 - Grand Avenue, Suite 1550
Oakland, California 94612

PROOF OF SERVICE